Petitioner Appellant and Christy Nutter Respondent Appellee. Arguing for the Appellant, Michelle M. Jochner. Arguing for the Appellee, James Lariah.     Thank you. Thank you, Mr. Chairman. You may proceed. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. Michelle Jochner on behalf of Appellant Michael Nutter. We ask in this consolidated appeal that you reverse portions of the parties' dissolution judgment and the order on reconsideration of that judgment, as well as the Section 2615 dismissal of Michael's later motion to modify his maintenance obligation. Your Honors have reviewed Michael's opening brief, which sets forth in detail four main issues. Our limited time today permits only a brief summary of a few key points. Turning to Michael's first claim of error, the Court's finding that he annually earned a guaranteed $3.2 million plus an additional amount of undetermined variable compensation is clearly against the manifest weight of the ample and unrebutted evidence presented at trial. That evidence showed that although his income had steadily increased over the years until hitting a one-time peak in fiscal year 2017, it began to decline the very next year, and he lost more in fiscal year 2018 than he had gained in 2017. The trial took place in December 2018, which was in the 11th month of the 2019 fiscal year, which closed on January 31, 2019. Because Michael's originations continued to plummet, he was told he would receive no fiscal year 2019 bonus, and he would also lose a couple of capital points, taking him from $25 down to $23. He testified that the only compensation that was guaranteed was his annual draw of $580,000, and it was only after the end of the fiscal year that he would know the remainder of his compensation. The Court overlooked this uncontradicted evidence and instead adopted an unsupported finding that Michael averaged a guaranteed annual income of $3.2 million plus an additional amount of undetermined variable compensation. It was based upon this that the Court set Christie's maintenance at $28,000 per month. Shortly after entry of the dissolution judgment in February 2019, Michael filed his motion asking the Court to reconsider its income finding based upon two main points. First, that the evidence at trial showed his only guaranteed compensation was his $580,000 draw and all other components were variable and not guaranteed. And second, that there was new evidence that was not in existence at the time of trial, revealing a steep decline in his income. Michael attached his exhibits to both his motion and to his reply documents he received from his firm in February and April 2019 that confirmed that his total compensation for fiscal year 2019 was $2.86 million, far less than the $3.2 million floor found by the Court. And second, that for 2020, which began on February 1, 2019, he lost 10 capital points, which were 8 points more than the 2 he testified he thought he may lose at trial. This took him from 25 to 15 points, which was an unexpected 40% reduction rather than the 8% he testified to at trial. In addition, his base annual draw was reduced by $200,000 to $380,000. Michael estimated that the loss of these 10 points would drop his 2020 compensation to as low as $1.5 million, which was about one-half of the $3.2 million floor used by the Court. In light of this new and compelling evidence, the Court's denial of relief upon reconsideration was an unreasonable abuse of discretion. Recall the Court simply stated that it had contemplated all the facts raised in his motion and found that there was no newly discovered evidence, which was not available at the time of trial. The facts established, however, that this is impossible, that this evidence could have been previously contemplated by the Court. Again, it is undisputed that this evidence was not in existence at the time of trial. And further, at trial, even Michael himself did not foresee this huge 40% decrease in his capital points, with the loss of 10 points and a decrease in his base draw of $200,000. Michael also requested to reopen proofs to include this new information. This then begs the question of how the Court could be aware of this non-existent evidence in crafting its dissolution judgment and how the confirmed steep decline could not materially impact the Court's income finding. The manifest weight of this new and unrefuted evidence called for the Court to revisit its prior ruling. As this Court has held in Sherman v. Crimes, the trial Court, as a finder of fact, is obligated to consider all of the evidence. Indeed, the Court gave no indication it considered the significant new evidence that more accurately reflected Michael's current income. Instead, the Court repeated over and over the incorrect statement that no newly discovered evidence was presented. As held in Carpell, it is improper to base an income finding on the mere possibility of future financial resources or on outdated information that no longer reflects prospective income. Because the Court did exactly this here, Christie received a windfall in an increased amount of maintenance, and this incorrect ruling requires reversal. Moving on to his second issue, Michael has shown that the Court committed an error of law in construing the stipulation regarding his partnership interest. In turn, that error led to both a tainted valuation of that interest that was against the manifest weight of the evidence and a division of that interest that was an abuse of discretion. Simply put, the Court valued and equally decided what it called an asset, even though it had no present value and therefore was not divisible. The stipulation established only a ceiling on any possible value of the partnership interest in line with the partnership agreement. It did not establish that the present value was the same as the account balance. Those were two different things. Rather than construing this five-sentence stipulation as a whole, the Court improperly viewed some provisions in isolation while rendering others meaningless. Significantly, it ignored the second and third sentences, which made it clear that Michael was not presently eligible for a payout, that he could receive such payout only upon his death, disability, or withdrawal from the firm, and that the amount paid, if any, would be determined at a future time. Under Centioli and Eadie, the ultimate payout of anything from the capital account is only a speculative expectancy, and it is not property to be divided upon dissolution. Worse yet, Michael was forced to take $300,000 from his own separate liquid portion of the divided assets to satisfy this judgment, with no guarantee that any money would ever be dispersed from this account, creating another windfall for Christy and yet another inequity for him, requiring reversal. On reconsideration, the Court also erred in rejecting Michael's proposal for alternative relief based upon the formula in intermarriage of Hunt. If the Court indeed had wished to value this account, which was not presently divisible, it could have treated it similar to an unvested retirement asset, where uncertainties also exist as to present value investing. The Court never addressed this proposal in its ruling. Moving on to his third main issue, Michael showed that the Citibag 0637 savings account was his non-marital property. Against the manifest weight of the evidence, the Court erred by treating the parties' accounts inconsistently. Even though the identical arguments were made that each of the parties' four accounts were non-marital, yet this account was the only one that was treated as marital. Also on reconsideration, Michael additionally argued that the Court should have valued this account based upon the more recent November 7, 2018 balance that was in the record, rather than the October 31 balance. The $350,000 difference in value represented funds Michael withdrew to pay the parties' 2018 tax liability that had not been allocated by the Court in violation of Section 503A of the IMDMA that requires that a Court equitably allocate both the parties' marital property as well as their marital debts. This overvalued the marital estate by $350,000 because the Court refused to either account for that sum as marital debt or to allocate it equally between the parties. This released Christie from bearing any part of this marital liability. It also forced Michael to pay the parties' $350,000 marital tax debt from his own separate assets, just as he was forced to take $300,000 from his separate assets to reimburse Christie for the partnership interest. In total, he was $650,000 worth off than Christie, even though the Court's goal was a 50-50 division. The Court's rulings violated 503A and made the division of property inequitable. Therefore, it should be reversed. Finally, as we explained fully in our brief, the Court committed an error of law by granting Christie's 2615 motion to dismiss Michael's petition for modification of the maintenance award. In a 2615 motion, the Court must view the allegations in the light most favorable to Michael, taking as true all reasonable inferences drawn from the well-pleaded facts. As we explained, Michael sufficiently stated the cause of action for modification, showing a significant decrease in income that served as a substantial change in circumstances. Accordingly, it was reversible error for the Court to dismiss his petition. Thank you, Your Honors. We welcome questions on these points or any other issues presented in our brief that we were unable to address in this summary. Thank you. Justice Hudson, do you have any questions? Yes, thank you. Good afternoon, Ms. Tuckner. Good afternoon, Your Honor. As I understand it, part of your argument is that the trial court found that Michael's monthly draw and his annual distributions to be guaranteed income. Is that correct? Yes, that's correct. Can you direct me to where in the dissolution judgment the trial court made that specific finding? Your Honor, I believe that it's a reasonable conclusion based upon the court's judgment. The court found that Michael, that his income was $3.2 million plus variable compensation that was not determinable at that time. That leads to the reasonable conclusion that when he's making a distinction between the $3.2 million on one hand and the other compensation that he termed to be variable but undetermined at this time, those are distinctions between that. And we believe that there is no other conclusion to be made than he believed that it was a $3.2 million guaranteed amount. I understand you're drawing what you believe to be a reasonable inference, but would you acknowledge that the court never specifically used the language guaranteed income? Is that correct? Yes, Your Honor, that is correct. Guaranteed was never there, but to read it any other way, I believe, would not be reasonable. Now, the trial court averaged Michael's annual income for the last four years in making its findings. Is that correct? Did it employ the income averaging method? It appears that way, Your Honor. It's a little bit sketchy because there is no indication as to how many years the court used. In its judgment, the court stated that it used several years but never said exactly how many years. And even Christie in her responsive brief indicates that she had difficulty determining as well how many years were actually used. But it is not your position that income averaging is impermissible under existing case law, is it? Oh, no, no. It's well established, Your Honor, that income averaging may be used where there is variable income and it is within the discretion of the court to do so. Our position is that, and I believe that in Christie's brief, she also cited the Friesen case for exactly that proposition, but she overlooked Friesen's further holding that a court should not base net income findings upon the mere possibility of future financial resources, and neither should it rely upon outdated information, which no longer reflects prospective income. And Friesen itself cited to Carpell, which we cited in our brief, for that same proposition. And in those cases, income averaging was discussed, and I believe that it was approved in those cases, but it also gave the caveat that when you're doing that averaging, that also a court should not ignore evidence. And here it was uncontradicted, unrebutted, unrefuted. Michael gave evidence about the decline in his income. It had declined already in fiscal year 2018. He had lost more in 2018 than what he had gained in 2017. And again, 2017 was an outlier year. It was very atypical. He went to trial six times in that year, and he also testified that he told Christie, this is really a once-in-a-lifetime event in terms of the very high compensation he received in 2017. 2018 decreased. The trial took place in December 2018, which was the 11th month of the 2019 fiscal year, and he had already been told that he was going to continue his decline, and that was uncontradicted. There was no contradiction in the record of that. That's the evidence that the court had, and it was evidence that actually was confirmed later on, after the trial had ended and after the fiscal year had ended. So, again, we do not contest that income averaging may be appropriate. There is absolutely within the discretion of a court to do so. But here the court ignored the evidence that was in front of it, and, again, freezing cautions, and so does Carpell, that a court should not rely upon outdated information, which no longer reflects prospective income. Your last comment segues perfectly into my next question about Michael's anticipated reduction in income, one of the overarching issues you've alluded to. And as you said, Michael specifically testified at trial about his anticipated reduction in income, but also didn't the court explicitly refer to the fact that it was taking that into consideration in arriving at its decision? Yes, you're right, Your Honor. The court did state that within its opinion. But, again, as we detail in our brief, that the evidence showed otherwise. That was against the manifest way that the evidence. The evidence showed a decline. $3.2 million, the evidence was uncontradicted, again, that his income was on the decline. And I think what's very pivotal is, in addition to the errors that we detail that were made during the dissolution judgment or in the dissolution judgment itself, I think even more striking is how the court handled the motion to reconsider. Because, again, this case is a little bit factually unique because of the way that the fiscal years at the firm work. The trial, again, was in the 11th month of the 2019 fiscal year. The 2019 fiscal year closed at January, January 31st, 2019. And Michael received his preliminary statement in February of 2019. And then the final statement in April of 2019. Both confirmed a significant decrease and even more so, 10 points. He had lost 10 points. And he had only, at trial, believed that he would lose only two points. So that would have been an 8% reduction in his points, which is what he believed at trial. By the time he received his compensation statement for fiscal year 2020, in April of 2019, it was confirmed that he would actually have a 40% reduction. That is a huge reduction that was not contemplated at that time, but it was presented to the court. So as we detail in our brief, it is impossible upon reconsideration for the court to have considered the new evidence, which was not in existence at that time of trial. And, again, we believe that that is very, very clear, that there was error on the reconsideration motion. With regard to the motion to modify the maintenance award, how would you respond to the argument that the motion was essentially premature because it was premised on an anticipated reduction in income? How do you respond to that argument? Your Honor, in Christy's brief, I know that there was argument that stated that this was all speculative. The court believed that as well. The court thought that this was speculative. The court was wrong. There really was no speculation here. The 40% reduction in equity points was documented in the fiscal year 2020 statement. Again, that was issued by Michael's firm in April of 2019. There was undisputed testimony at trial that equity points directly correlate with his income. This is why his annual draw for fiscal year 2020 also decreased by about 35%. That was an early reflection of what was to come. And, Your Honor, the historic compensation reports that are part of the record here and also exhibits to the record, all of those compensation reports from Michael's firm that show his past compensation, they support that this is not speculative. The last time that Michael had 15 points was in fiscal year 2014. If you look at that fiscal year 2014 compensation report that's in the record, his total compensation was $1.1 million. And that shows the direct correlation between the number of equity points and also his compensation. So, in addition to his testimony that there was correlation, these historic compensation reports support this as well. So, it's our position that it was not speculative, that the court had before it all the information that it needed. And I also would like to note that in that motion to modify, Michael also requested that the court consider making the modification temporary and then revisiting it. But for that time, it was clear. The writing was on the wall. The evidence was in the record and before the court that there would be a drop. All right. Well, let me ask you this. With regard to the valuation of Michael's partnership interest, and you alluded to the stipulation earlier, the fourth sentence of the stipulation appears to state clearly that the parties stipulate that the present value of the capital account is $600,000. How do we overlook that? Your Honor, as we explain in our brief to this court, this is interpreted similar to a contract. And the rules of contract construction require that the contract must be viewed as a whole and clauses or provisions must not be looked at in isolation and detached portions of the document cannot be looked at on their own. As we explain in our brief, there are five sentences to the stipulation. And the first sentence, I'm sorry, the first sentence of the stipulation provides that the parties agree that the value of his partnership interest, to the extent that it has a value at present, is limited to at most the balance in his capital account. Then the second and third sentences, as I alluded to in my opening, give conditions for the payout of the capital account only upon Michael's death, disability, or withdrawal from the firm. These are linked to specific provisions in the Article 3 of the 2017 Partnership Agreement. That Partnership Agreement was incorporated into the stipulation and it was attached as Exhibit A to that stipulation. These provisions cannot be overlooked in interpreting the entire five sentences of Section 2 of that, of the stipulation. The third sentence stated that at present Michael is eligible, is not eligible, to receive a payout in the future from this capital account. And the value of it in the future if, as, and when it is disbursed has not yet been determined. And then as you said, the fourth sentence states, both parties also stipulate that the present value of Michael's capital account held at Liston & Strawn is in the amount of $600,000. Again, we do not believe that you can look at that fourth sentence in isolation. It is conditioned upon the prior three sentences as well as the incorporation of the amended and restated Partnership Agreement that is explicitly incorporated and attached as Exhibit A. All right. That's all I have at this time. Thank you, Ms. Stockner. Thank you, Your Honor. Thank you. Justice Enoff, do you have any questions? Yes, I do. Thank you. In view of the fact that Michael's testimony, as you, I think, indicated, included facts that his 2019 compensation and I think 2020 compensation would decline and the points would be reduced, how was it an abuse of discretion that the trial court refused to reopen the proofs? The trial court had that evidence via testimony. Yes, Your Honor, you are correct that there was testimony about the decline. But as discussed with Justice Hudson, the testimony at trial didn't reveal the entire picture that evolved after the trial concluded. Again, the fiscal year had not concluded until one month after the trial. And the evidence that was presented on the motion to reconsider and also would have supported the motion to reopen proofs, it showed an even steeper decline than what Michael had testified to at trial. Again, at trial, he thought he would lose two equity points, which would have been 8% of his total points. Instead, he lost 10, which would be 40%. And that directly correlated with a $200,000 drop in his annual draw to $380,000. And the court, I would like to note as well, with respect to the motion to reopen proofs, the court did not address this at all in the motion to reconsider. It never mentioned the motion to reopen proofs. There is no ruling, specific ruling on the motion to reopen proofs. There is silence from the court on this. And as we note in our brief, there is ample case law, including INRAE and State of Benin, that greater liberty should be accorded to reopening proofs in bench trials, especially to administer justice. The court considers the four factors stated in INRAE Marriage of Weinstein. And in our brief, we detailed how Michael met all of these factors with respect to the court reopening proofs here. This was evidence that there was a reasonable excuse for failing to submit this because it did not exist. You know, the very significant decline in the equity points, as well as the $200,000 drop in his compensation, that in concrete form did not exist at the time of trial. And there was no opportunity to introduce it again because it did not exist. It did not result in surprise or unfair prejudice to Christy because Michael, as you point out, did testify at trial that he did know that he would have a decrease. And there was no prejudice because to present it during the dissolution proceedings and to dispose of that, it would have been more judicially economical than having to go through a motion to modify, which eventually had to happen. The evidence was of utmost importance. It was a key issue in determining Michael's income and Christy's maintenance. And there was no cogent reason to deny the motion was stated by the court. Again, it didn't even mention the request. Okay. And I have one other question. With respect to the bank account, didn't Michael, we asked in the trial court's reliance on the October 31st, 18 balance by using this balance in the oral argument and not the November 7th, 2018 balance? We do not believe so. You know, it was that evidence was in the record. The November 7th evidence was in the record. It was this particular account as we detail in our brief. This particular account was the only account that was characterized as marital despite identical arguments being made to all four of the accounts that they were non-marital. And both parties viewed the orders underlying where the funds flowed from. It was a December 1st, 2017 order and the May 10th, 2017 order. Both parties viewed those orders as really establishing in effect that the accounts were non-marital. The trial court treated these accounts inconsistently. And because of that, that was the only reason that the tax issue then arose. There was. Okay. Thank you. I don't have any other questions that have not been asked. So, thank you. Thank you, Your Honor. Thank you. Do you have any more questions? No, I do not. Okay. Ms. Jochner, did the trial court explain its rationale for why it didn't give your client credit for the payment of the income tax? No, Your Honor. No, no. There is nothing in the rulings that explain that. Okay. I have no further questions. Thank you. Ms. Jochner, you'll have an opportunity to make rebuttal. Thank you very much. Counsel, you may proceed. Yes. Thank you, Your Honor. Good afternoon. May it please the Court. My name is James LaRae and I represent the appellee, Christine Nutter. This is a case like so many in divorce judgments of determining whether the trial court abused its discretion in determining the maintenance to be paid and whether the court's determination of the valuation of the assets was against the manifest weight of the evidence. It is Michael Nutter's burden to show that Judge Cruz abused his discretion in determining the maintenance amount. He is to show that no reasonable person would have taken Judge Cruz's view when determining the maintenance obligation. It's respectfully submitted that Michael has not met this burden and that the evidence supports Judge Cruz's determination. That evidence shows, in terms of Mr. Nutter's income, that in 2018 at the time of trial in early December, that Mr. Nutter, taking into account his income up to that point, as well as the additional two months of the funds that he would receive on a monthly basis as his draws, that his 2018 gross income would be $3.3 million. The court also, based upon the evidence of the income tax returns, end-of-year paycheck stubs, and W-2s, would reflect that the three-year average for Mr. Nutter would be $4 million and that the five-year average would be $3.3 million. The court's judgment correctly noted, and quote, based upon the last several years and discounting substantial bonus in 2017, Michael's income can be conservatively averaged to $3.2 million per year. This is what the evidence has provided, and the court has properly applied an income averaging of those years to come to that determination. In regards to the duration of maintenance, this was also properly found by the court. You had nearly a 20-year marriage. The court enumerated in detail the lifestyle, earnings, property acquired, lack of debt, and other factors that supported the appropriateness of this maintenance. The court set guideline duration pursuant to Section 504 at 15 years and 9 months as you had a 19-year, 8-month marriage. Michael argues that the duration should be 6 years, as the court found some credible testimony with respect to a planned retirement at age 55, Michael being 49 years of age at the time of trial. The court addresses this argument by providing in the judgment Section 510 modification language, indicating that Michael, as other individuals would have, would have the ability to file a Section 510 modification motion if he were to retire. This is noted in Document C-246 of the judgment. The amount was also appropriate and well within the discretion of the court. The court originally set that amount of maintenance at $28,000 per month and then reduced it after the motion to reconsider to $23,000. The court enumerated its findings in great detail in the judgment, providing for the party's income, the needs, addressing the lifestyle of the parties, that being an evaluated standard of living, addresses the earning potential of both parties, imputing income to Ms. Nutter at a higher amount than what was shown in the evidence that had occurred over the last 5 years prior to the marriage, addressed the duration of the marriage at 19 years and 8 months. The court correctly did not give weight to the argument that Christy had filed a prior petition for dissolution of marriage that was dismissed in May of 2016. The court addressed the age, health station, and occupation, finding that these parties were relatively young, that Michael was a partner at a prestigious law firm, and Christy's employability was not merely that of Michael's, and also finding that both parties had contributed to both the acquisition of assets as well as wealth during the time of the marriage. Michael has failed to show that the court abused its discretion in setting the maintenance at $23,000 per month. Michael's main argument is that the court overestimated his income at the $3.2 million as the evidence had shown versus $2.86 million that he pled in his motion to reconsider. As outlined in Christy's brief, even if the court would have considered his new income level at $2.86 million, that maintenance at $276,000 per year would still be accurate and fall within the discretion of the court. It would not have been an abuse for the court to find that the $276,000 per year was appropriate. As the court correctly noted, this was necessary to maintain the lifestyle the parties are accustomed to during the marriage, including the ability to further save for retirement. Michael focuses on the $23,000 being used by Christy to pay her expenses, not taking into account that the court was proper in taking this amount and the imputed income, which she is not receiving, to realizing that she would have the ability to contribute to her retirement as the court found the parties did throughout the marriage. In conclusion on the issue, the court's finding is only supported by the evidence that was provided during the trial, and Michael has not shown that it was an abuse of discretion. In regards to the property valuation, it is respectfully submitted that Michael has failed to show that Judge Cruz's valuation of Michael's Winston and Strong capital account at $600,000 and the 0637 account at $558,000 was against the manifest weight of the evidence. Michael has also failed to show that the court's determination that the 0637 account was marital, subject to division, was also an abuse of discretion. In regards to the Winston and Strong account, as your honors have already alluded to, the parties stipulated to same as provided in Exhibit 126. It's important to note in regards to that stipulation, even though Michael attempted to reduce the future value of that account or attempted to testify that there was no value, the stipulation showed to the contrary, and Michael confirmed that during the marriage he had paid $600,000 into the firm, into the capital account for the points. As your honors have reviewed Paragraph 2 of the stipulation and correctly noted line number 4, you cannot avoid that the parties stipulated that the present value of Michael's capital account was $600,000. In addressing the other sentences of that same paragraph, Paragraph 1 discusses that if there is a value, it's equal to the capital account, which was supported by the exhibit of Mr. McDonald's email also put into evidence through this exhibit. The next sentence, the second sentence, provides for how and when those payments can be received, Michael's death, disability, or withdrawal from the firm. It would not provide that there isn't a value, but provide when the value would be received. The third sentence indicating that President Michael is not eligible to receive a payout from his capital account and the value of it in the future, if any, is not determined, that's accurate because the three provisions providing for when he can receive it had not yet occurred, so the future event had not occurred, but the parties still entered by stipulation, as provided in the fourth sentence, that the value was $600,000. It was not improper or against the manifest way to the evidence for Judge Cruz to find same. In regards to the 0637 account, Justice has nailed this issue right on the head. The account was valued as of October 31 of 2018 at $558,158.68. That was supported and furthered in Michael's closing argument as attached to his exhibit B. The tax debt issue was not raised during the time of trial, but was raised as part of the motion to reconsider, and the tax debt was not listed in exhibit B attached to the closing argument or listed as a debt of the parties. So accordingly, that was not evidence at the time of trial. So the court properly found, based upon the manifest way to the evidence, that the value of that account at that time of 10-31-18 was $558,000. The court also properly found that these funds were marital funds. This is because the statute presumes that it is marital funds. It is Michael's burden to show that it was not. There was no agreement or order or evidence in the record reflecting that Michael's earnings during the course of litigation would be construed as his non-marital income. The December 1, 2017 temporary support order did not provide any language to that effect. So accordingly, Judge Cruz was proper in finding, based upon the manifest way to the evidence, that that account was marital subject to distribution. In regards to the motion to reconsider, as your honors have already addressed, the arguments that were made by Michael in regards to the reduction of income from $3.2 million to $2.86 million was anticipated. Judge Cruz provided for that in the judgment. And again, even in view of Christie's brief laying out the amount, the $23,000 of maintenance was within the judge's discretion, taking into account the amount of net funds each party would have due to their earnings. Under the motion to dismiss, the motion to modify, that was properly granted as Michael had failed to raise in the motion to modify a substantial change in circumstances as that was already considered in the motion to reconsider during the time of trial. And we would ask that your honors were to affirm Judge Cruz's judgment. We now welcome any questions by the court. Thank you. Justice Hudson, do you have any questions? Yes, thank you. Good afternoon, Mr. Loria. Good afternoon, Justice. Mr. Loria, tell us why the trial court was not required to at least reopen the proofs in order to consider Michael's fiscal year 2019 and fiscal year 2020 compensation information. Because I think what was necessary for the trial court to understand, which I think it did, was that the 2019 fiscal year income, which would be the upcoming income as provided in the April 2019 exhibit, that of course did not exist at the time of trial, but the facts did, was anticipated earnings that Michael would have in 2019. The court already had before it the testimony of Michael as well as his earnings, which would show, as we provided in our brief, the yearly income that he would receive. As of 2018 December, he was already at $3.3 million. His testimony providing for the reduction or anticipated reduction in his earnings, as testified to, provided the special bonus, the additional $500,000 bonus, as well as the points that would be subtracted would account for $1 million. His testimony was based upon the earnings of 2017, not of 2018. So the court would not be required to reopen the proofs when the testimony already provided for what that reduction would entail. So the court would have already reduced the $5 million from 2017 to an anticipated 4 and moving forward. I think Michael's application of fiscal year under Winston and Strawn versus calendar year under tax return and end-of-year paycheck stub causes some of the confusion to try to create a basis that I will make less money when the facts presented to the court at that time showed what the funds were and the gross income that he received. All right. In the course of the court making its findings, it alluded to, I believe, in essence, that Selma Christie's monthly expenses were inflated. Is that correct? Yes, that is correct, Your Honor. Why doesn't that call into question the propriety of the amount of the maintenance award in this case? Because I believe that the court reviewed many different factors. One of those factors was in addressing the lifestyle of the parties and addressing the monthly expenses that the parties were used to on that lifestyle. The evidence showed $30,000 a month was spent in those expenses. The inflation was Christie providing $32,000 a month in expenses. Michael's expenses at that time, as provided by the evidence, was $26,000. So I don't believe that it was improper for the court to estimate an amount between the $26,000 or the $32,000, given the inflation, taking into account the standard of living and what the parties enjoyed during the course of the marriage. All right. My final two questions. With regard to the stipulation that everybody has been alluding to in this case, what does the qualifying language I'm looking at, if any, mean to you in the stipulation? What does that mean, if any? Are you referring to which sentence, Your Honor? I apologize. I don't have it in front of me at the moment, but I did make a note about that as I was reviewing it. The first sentence indicating the parties stipulate and agree that the value of Michael's partnership interest with women is five. Number? Stipulation five or paragraph five? Number five? Does that have the, if any, language? The fifth sentence only references the exhibit, Your Honor. Number five? The fifth sentence indicates to the extent it has value at present is limited to at most the balance. And so my interpretation of that would be if there is a present value, that's what's provided in the capital account balance, which was reported at $600,000. The third sentence, which talks about the value in the future, if, as, and when it is dispersed, has not yet been determined. My interpretation of that is because the events, as provided in the prior sentence, had not yet occurred. He was not, he had not passed, there was not disability, there was not a withdrawal from the firm. So that value actually could have raised in the future or lowered in the future as he continued with the firm, so the parties could not determine what the value was in the future. But the fourth sentence clearly indicated both parties stipulate the present value was $600,000. I'm not sure if that answers your question. Michael did explicitly testify that he could not stipulate to the future value of his capital account. Is that correct? Yes. Okay. Yes, he did because he had testified to other factors that were considered when those points were paid out, could be accounts receivable and other issues at that time. That is correct, Your Honor. All right, thank you. That's all I have at this time. Yes. Thank you. Justice Zenoff, do you have any questions? Yes, I do. Thank you. Well, along the lines of looking at this capital account, why shouldn't the Winston Strong capital account of Michael's been treated like an unvested retirement asset? That is, when he received the payout, Christy would get her prorated share. Because it could have been handled in two ways, one of which is that the parties stipulated to the value of the account. And I believe that Judge Cruz had anticipated properly that Mr. Nutter would continue to be employed by Winston and Strong and continue to gain capital within that account. Also, under the provisions of the account agreement, when the capital points are reduced under page six of section 3.04 of the agreement, upon a reduction in those number of points, the partner shall be paid those capital monies back. So the court at that time could reasonably provide, due to the stipulation agreement of the parties, that the value was $600,000. And so what were to occur in the future would benefit Mr. Nutter due to him being employed at the firm, working at the firm, and being able to grow that capital account. Okay. How was it reasonable to award Christy 16 years of maintenance when Michael had plans to retire, which he acknowledged in five years, that is, at age 55? Because the court provided the ability for Michael, as most individuals have,  he can come in on a 5-10 motion to modify to argue a substantial change in circumstances at his point in retirement. At that time, then the court could determine, in looking at the totality of the evidence at that time, as to what, if any, maintenance should be paid from Mr. to Mrs. This was a case that had a 19-year, 8-month marriage. Under the guidelines of Section 504, that would provide for 15 years and 8 months or 9 months of maintenance to be paid. So that would be appropriate. Plus, even though the court had indicated that there was some credible evidence in regards to an anticipation of retirement, Mr. Nutter was not in a retirement plan at that point, in the sense that there was no testimony that he was winding down, there was no testimony that he was providing other clients to other partners as part of a retirement wind down, there was no testimony that he would be working less. This was not a gentleman at 49 years of age that was already in his pre-retirement plan. This was a gentleman that was working who, quite frankly, testified that these conversations occurred in the past when the parties were together saying, we're on track to retire at 55 if everything continues. The court anticipated that by providing the 510 language, allowing for Mr. Nutter to come into court with a proper motion to modify if it was appropriate at that time. Okay. And going back for just another minute to a final question with respect to the capital account, it wasn't really a payout of anything from this capital account. The equivalent of something very speculative, like a speculative expectancy and not something that is appropriate or was appropriate to be divided at a dissolution. Well, I don't believe so because the partnership agreement would provide that it would be paid out if he were to lose points. The court was aware of the anticipated reduction of points, so it could be aware that these monies would be paid out from the capital account when the points were reduced. Plus coupled with the fact that he maintained his employment at Winston and Strawn and was to continue to work there. Okay. Thank you. Those are all the questions I have at this time. Thank you. Mr. Lariat, could you refresh my recollection as to why one of four savings accounts was determined to be marital property and the other three were not? Yes. I believe that in addressing the accounts, and I apologize, I believe I can address three of the four. I know one of the accounts that was Michael's, there was specific testimony that he had placed into that account designated monies under a separate order that were designated as his non-marital. So when Ms. Nutter received a prejudgment distribution of funds, I believe it was $200,000 or $250,000, Mr. Nutter received the same exact sum and put that in a separate account. That would be his non-marital as a prejudgment distribution. When Ms. placed her funds into an account under her name, that would be her premarital distribution. In regards to this other account, the testimony was that it was Michael's earnings that went into that account. Those earnings were not classified by any order or agreement of the parties as being non-marital. So that's why that account was properly found as marital. And I apologize, Your Honor, I don't have the answer on the fourth account. I apologize. No problem. I have no further questions. Thank you. Yes, Your Honor. Thank you. Sure. Ms. Jockner, you may make rebuttal. Okay. Thank you, Your Honor. Respectfully, we have met our burden to show the multiple errors that occurred here, both within the dissolution judgment and also on the motion to reconsider. With respect to the amount of maintenance, indeed, the court found that Christy had inflated her expenses at the time of trial. And as we know in our brief, originally she requested more than $100,000 a month in maintenance. The court correctly found that it was inflated, but still got it wrong. I believe that we have talked about the fact that Christy, her ability to earn income, she has a great, a great potential to earn income. Recall that as part of the dissolution judgment, she received $3.5 million of the emeritus estate. She's a 44-year-old educated woman who is an engineer, and she worked 18 years of the 19 years of the marriage. Now, in her brief, she admits that she is not working by choice. This alone shows that the maintenance award was excessive, that the amount of the maintenance award was excessive, as she can apparently maintain her lifestyle without supplementing that amount that Michael gives her without her own work income, as envisioned by the court to cover her needs. And counsel mentioned that Christy needs this amount of money to allow her to accumulate funds for her retirement. But again, we underscore the fact that she is not working by choice. Rather, as the court itself noted in its judgment, she has spent considerable amounts of time training for marathons and also Ironman competitions. Michael should not be deemed her guarantor for her retirement or for the remainder of her work life. She should work. With respect to the duration, there is credible. The court found Michael's testimony credible that he would retire. He was planning to retire at age 55. Others at the firm did so at 55. This was not unique. And just because also counsel noted, just because the court increased Christy's imputed income on reconsideration, this does not offer any remedy to Michael for the errors as to his own income. With respect to the partnership interest, just as Hudson was correct, that Michael testified that he could not stipulate that the balance of the account of the partnership account was the value. Indeed, the evidence shows that the balance does not does not equate to the value justice. You're absolutely correct. That senti only establishes that this is a speculative expectancy and it is not property. The stipulation must be read as a whole. And Michael's testimony is important here that the value of the account could be zero. If the receivables exceed what he has in the, in the account. And at the time of trial, he had $2 million in receivables. And if he were to leave or what's to be terminated, it would completely wipe out whatever was in that account because it would exceed it. And just to see enough, again, you correctly note that the hunt approach was a very good option here for the parties. Under this approach, Michael could receive credit for his post divorce efforts. And Christy could receive her marital interest if, as, and when the value for that interest, if any would be actually received by Michael. And again, Michael raised this on reconsideration and the court did not acknowledge it. It was never addressed the same thing with the motion to reopen proofs. It was raised and it was never addressed by the court and it's ruling on reconsideration. So we don't know what the court thought about the reconsideration motion because it was silent. And again, in a bench trial, a court should lean more heavily towards reopening proofs just to make sure that substantial justice is achieved with respect to the tax issue. That issue only arrives because of the inconsistent treatment of the four accounts. And justice McLaren, those accounts were the six, three, seven account that we're talking about in our brief is the savings is Michael savings account. The nine, eight, five, six account was his checking account. And both of those contained income allocated to him pursuant to the December 1st, 2017 agreed temporary support order. So after the court divided his income and gave Christie her income on the temporary support order, what remained went into these two accounts and the fourth account, I'm sorry, the third account of Michael was the six, six, five, six savings. So I'm sorry, I hear that. If I could just finish this one point about the accounts that six, six, five, six savings account that also was Michael's, it contains funds received from the $250,000 pre-distribution from the marital estate, which was granted under the May 10th, 2018 order. And then the fourth account was Christie's eight, eight, five, six city bank account, which also held her temporary support payments under the December order and the 250,000 pre-distribution her, her $250,000 pre-distribution from the May 10th order. In closing, as we detailed in our brief, the record contains ample and unrebutted evidence that the court simply ignored in its ruling, rendering it erroneous and also inequitable. And we ask that the court reserve reverse those rulings and we may have this cause for further proceedings consistent with that decision. Thank you very much. Your honors. Hello. I'm here. I think justice. I muted my phone. I've unmuted it now. Are there any questions? Justice Hudson? No, I have no further questions. Just to see enough to you. No. And neither do I thank you. The proceedings are now terminated over and closed. Thank you. Thank you. Thank you. Thank you.